Good afternoon, Your Honors, and may it please the Court. 24 years ago, the City of Redondo Beach Thank you, Your Honor. I'm sorry, Michael W. Webb, Redondo Beach City Attorney, appearing on behalf of appellants. 24 years ago, the City of Redondo Beach, trying to deal with, after several years of extreme difficulty in dealing with traffic issues caused by persons soliciting employment from the highway or railway or selling certain products, and in trying to deal with it in a constitutional manner, copied, word for word, an ordinance that had been approved by this Court some eight months before. Here we are now, 24 years later. We're pushing our seventh year of litigation in the city, defending itself on a facial challenge of the very ordinance that this Court approved, and that has been approved several times even Yes, it was. It was subsequently amended to add a B section to make certain that it applied equally to both the employer and the employee of solicitation. It also made some non-substantive changes. But moreover, we're now in an unbanked court, so it's fairly irrelevant, actually. In terms of the Court has even, as recently as fewer than 18 months ago, recognized the validity of the ACORN decision, and the ACORN decision was quite properly decided that this is a proper time, place, and manner restriction. The That was quite different, though, wasn't it, the ACORN case? That was really a situation where people were running out to the cars, asking for contributions. The driver had to reach in his or her wallet, get the money, give it to them, take any change back, and the like. Moreover, it was an as-applied challenge, was it not? It was both. It was both as-applied to the tax, but they also asked for the Court to determine that the ordinance was unconstitutional in its face, overbought, and the Court, in ACORN, specifically indicated that it was not, just as this Court in Bonk indicated that it was a content-neutral ordinance. And you contend, I gather, this is content-neutral, right? Absolutely. Even the district court at the lower level agreed that it was content-neutral. This Court in ACORN has indicated it's, in the case of the sentence approving ACORN, that it's content-neutral. And this Court speaking in Bonk in Berger in June of 2009 indicated that it's content-neutral. Are A and B any different, though? The language is, you know, B isn't an entire flip side to A. B is more limited as to certain activity as to the employers. Correct. And I think it's because the Court, the city was trying to address the actual problem that the city was having. It was an equity situation. So that if there was a situation where the employee is violating the ordinance, the employer is as well. Wouldn't the traffic issue be completely dealt with? Sorry. Section B. In other words, people could chat all they want on the sidewalk, but if nobody can stop and park their car, then there's no traffic problem. Correct? You would, you need both. Why? Well, for two reasons. One is, it's limited more specifically to the employers who are reacting to the solicitation or trying to hire work. It doesn't. What difference does that make? If the problem that the city is experiencing is a slowdown of traffic, people stopping, blocking the streets, then why isn't it a complete answer to tell them not to stop and block the street? Well, in the original memo from the then city attorney, they addressed not only the issue of the employers, the employees soliciting work. It also talked about people who were selling items for the median and other areas of the street. The B would not cover that subsection. And again, we're trying to address the actual concern we have. We don't have numbers of cars going to look for people to give donations to or going to look for. But how is there a problem at all if there is, if somebody pulls up and parks a car illegally and comes to talk to somebody, and somebody comes up and talks to them, which happens in all manner of interactions aside from these? It's never been enforced or interpreted that it applies to people who are parking legally, and certainly it's not. Well, first of all, it doesn't say that. And second of all, B certainly seems to apply to that. And again, B has, as the record has shown, it was never, ever applied to people who are parking legally. As a practical matter, where these things have occurred are areas where it's very, very easy. I mean, one of my overall reactions to this case is why didn't you write the ordinance to cover what you wanted it to cover instead of all manner of other things? We did write it to cover specifically what the issues were. And it shows you're covering people who are parked legally. You're covering all, the whole city, even though you seem to be interested in two intersections or two streets. You're covering people who are, as I understand it, who are standing on the sidewalk saying, you know, go around the corner and buy something. You're covering all manner of things that are not what you say your problem is. If I could address that in two parts. First, we're not covering the people who say go around the park and come and talk to us. It's not soliciting to stand there and say I have cars for sale right over there, come buy one? No, it's not. As this Court instructed in Acorn, it is not. It is that interaction, it is that immediate exchange that is the solicitation. And again, it's not that we passed the ordinance first. If I get a mailing in my house that says please send me some money for a charity, that's not a solicitation? It's not within the meaning of this ordinance. Again, we adopted this ordinance word for word. And to address the first part of your question, the reason we adopted this ordinance is because we were trying very hard to follow and make certain that we addressed our issue, but getting a constitution. You didn't adopt the ordinance word for word. You added the second sentence in A, which is a definition I understand taken from elsewhere in California law, but that was not part of the Arizona law. That provides you with a definition that says that street or highway includes sidewalks. Well, I would make two points. One is that the Acorn's decision specifically indicated that it was presuming that sidewalks was part of that definition in rejecting the facial challenge to the Arizona statute. It did also talk about the fact that the plaintiffs in Acorn had preserved a void for vagueness challenge. So what we were trying to do is, one, putting it in there, it didn't change anything. It was what the definition of street or highway would have been, what it was in Arizona, what it is in California. It was giving greater notice to people what it covered. But it had no change, because specifically in footnote 9 and on the last page of the Acorn decision, it specifically presumed, for purposes of rejecting the facial challenge in Acorn, that it had included the sidewalk. How does the city get the idea that this is content neutral when, in fact, it bans some types of solicitation and permits others? You ban solicitation involving, in quotes, employment, business, or contributions, but, for example, you don't ban moral support, you don't ban people asking for your vote, you don't ban people asking for directions. Isn't that a content-specific, content-based ordinance rather than a content-neutral ordinance? Well, I would say we get the idea from this Court that it is. You don't ever want to do that. And not only in Acorn, but in Berger specifically, this Court indicated that this is a content neutral. And even below, the district court indicated it was content neutral. Because when looking at the act of solicitation, unlike the HW case or unlike the Berger case, which this Court specifically distinguished the ordinance in Seattle from the ordinance here, the ordinance in Acorn, it was the act of solicitation that the ban did not apply. But if I said that they lied on Acorn and the ordinance that was approved in Acorn, but now sitting on Bonk, Acorn is up for grabs, is there any interpretation, any narrowing interpretation of the ordinance that the city has done or that a state court has done other than just your declaration or other declarations about how it's interpreted? Well, and again, in terms of how it's been enforced, it's only been in areas that affect traffic. But is there any sort of formal interpretation like administrative guidelines or agency guidelines? No, there are not specific agency guidelines. I think, again, what we were following is the precedent in terms of, to address the earlier comment, the reason it doesn't cover the solicitation, why it doesn't cover holding up the sign or even passing out the specific handbills is that specifically the reason it doesn't cover the solicitation is that it doesn't cover the specific handbills. So we believe that has been determined by this Court not to be included within this ordinance. So if Acorn was wrongly decided, then where does that put you? We believe Acorn was properly decided, but under the same standards, it's still a proper time, place, and manner of restriction. As this Court spoke on Bonk, it's content-neutral. It's clearly addressed to a substantive. How would it be narrowly tailored, though, in terms of that, including the sidewalks? And that concerns me. Well, again, it's only the sidewalks in the way, the manner in which it affects traffic. So holding up the sign, saying, you know, talk to me, holding up the sign, park legally, handing flyers to an occupant of a vehicle clearly aren't covered. What we're talking about is that. But why is that? Because the language is very broad. I mean, absent Acorn, you have broad language that would cover any solicitation anywhere in the city from the sidewalk to perhaps a legally parked car. There's nothing in the plain text that limits it. So help me understand how I find the narrower interpretation that addresses the traffic disruption issue. Well, and again, it's we were relying on Acorn and the analysis in Acorn in terms of what was covered in solicitation. Aside from the fact that that's not, as we've now said about four times, not terribly helpful, I don't know even know where you're getting that in Acorn. Acorn was dealing with that situation, and that's why it was dealing with the situation. That was a circumstance in which people were going into traffic to solicit for money on the spot, and therefore, that's what the case covered. But why you think that it said that that's what the statute was limited to, that's what I don't understand. Well, without going into the – in terms of the analysis of it as of Acorn, when it looked at what specifically is the action, it just has, when you look at in terms of Berk, what we're talking about is the need for an immediate exchange. It's different holding up a sign saying, come talk to me. Well, that would be maybe a perfectly valid statute, but it doesn't look like the ones you have here. But it is the one we adopted based on what this Court said it meant. So it's not that we created an ordinance and then a lower court said, here's the ways to be interpreted. We took what this Court said this ordinance meant. We've enforced this ordinance in the manner in which this Court said it was to be enforced. Well, you maybe didn't get a chance to totally answer Judge Priby's question, but it's of some interest to me that this really isn't the same statute. B was not in the Acorn statute, correct? That is correct. And B is not anywhere, any place in B we're talking about business or contributions. We're only talking about employment, correct? That's correct, Your Honor. So B is really regulating then only one particular activity. It was regulating the activity that was... No, to answer my question. So it really only regulates one activity, hire or hires for employment, correct? That's correct, Your Honor. Now, if that's so, then I guess I'm having a tough trouble why I shouldn't throw B out based on what the Supreme Court said in Carey v. Brown, which again dealt with employment, dealt with this time an exemption for employment that it violated the Equal Protection Clause because it discriminated between lawful and unlawful conduct, accorded preferential treatment to the expression concerning one particular subject, labor disputes, which seems to be exactly where we are here, employment, only one particular issue. So why is then B not unconstitutional? Again, the city was trying to specifically address the realistic concern. There isn't that was presented to it in terms of you don't have they were trying to do make it... Well, I understand what the city was trying to do, but that isn't the issue here. The issue here is now contract neutral. And now the city has not acted, which is only, which is limited to several different things like business or contributions or employment, which may pass under Hill. But now as to the B part, it focused in only on employment. And Carey seems to be right on all fours. Well, I would think under Hill, given the fact that we're focused on the act of the solicitation and we're focused on the actual practical matter of what the city, I don't believe, is required to come up with every theoretical situation presented to it. It was trying to come up with specifically a way to have it enforced in an equitable manner between both the employees and the employers. But the bottom line following up on Judge Smith's question is that you don't ban all solicitations. You ban those related to business. You don't ban it for voting. You don't ban it for Girl Scout cookie solicitations. You don't ban somebody soliciting people to come join a book club. It's just for employment. And under those circumstances, is this not a content-based ordinance rather than a content-neutral ordinance for constitutional analysis purposes? Well, I think that the under Hill, you can go through broad grounds like that. And again, you're looking at the action that we're regulating, not the content of it. So I believe under Hill we're able to do that. I think also when you look at it, it's not the mere hypothetical situation. But it does have to be practical, doesn't it, counsel? I mean, in Berger, we indicated that ACORN was to be narrowly construed, right? Do you remember that? Okay. So if you take that as narrowly construed, and then you take it to the point that Judge Smith pointed out, and Judge Rivey and others, you get this Part B, which is new. It's not part of the ACORN situation. And you've also added a little bit to the A part as well. We don't have the identical statute. And that indeed in and of itself changes the ballgame because you've got the employment focus and you deal with the sidewalk issue and the like. I know that in ACORN there was an assumption about the sidewalk. But this expressly states the sidewalk. And it really kind of changes the ballgame because in ACORN you have people running out to the car, right into the middle of traffic and exchanging money. Whereas here, so many things. I live in Manhattan Beach, so I know about Redondo Beach. It's a very nice town and people are friendly and all that sort of thing. A lot of things happen on the sidewalk that have absolutely nothing to do with what they had in ACORN. So I'm puzzled as to why the city is so obdurate in its refusal to take the fact that this is a content-based ordinance. It is a restrictive ordinance. It bans some solicitation, but not all solicitations. Do you agree with that? I don't agree with it, specifically as to the A count or the A section. Because of the fact that this Court has held content neutral, this Court talked, again, specifically about the immediate exchange. And in Berger, it cited to concurrence from Justice Kennedy, and it talked about the nature of how that immediate exchange. If the interpretation, if you're regarding what we said in ACORN and in Berger as an interpretation of solicit, then isn't the major circumstance that you're trying to cover outside of it? In other words, you're trying to deal with people who are trying to get themselves hired as daily workers. There's no money exchanged, right? It was both. When you look at the original memo from the city attorney, it referred to both. But in fact, the enforcement that triggered this lawsuit involved people who were not, in fact, exchanging money. Is that right? Well, again, this is a facial challenge. This ordinance has been enforced many years, many times over the years. It would be helpful if you answered my question. Is that true? It's not true because of the fact that I don't believe the immediate exchange necessarily has to be the immediate exchange of money. Well, it wasn't Berger and it wasn't ACORN and it wasn't Lee. And they all talk about the fact that physically transferring the money is what makes it contact and not speech. Is that right? But it's the immediate exchange that is, because the problem is. What's the exchange? It's an exchange of words. Do you want to work for me? Yes, I'll work for you. Right. And that's exactly. It's a negotiation. It's something. It's not the mere. It's why the leafleting is perfectly appropriate. It's why you can go up to a car and say, pull in here, hire me, here's my cell phone. Whatever it is that you, that is protected, it's just that exchange, the, in terms of whether it be in employment where it's that negotiation, I will pay X amount for this amount, you know, I'll, I want X number of hours. So if somebody goes up and gives them a car and says, here's my cell phone and I want to work for you, that's okay? Yes, it is. It is absolutely okay. And again, that goes back to it's similar to that immediate exchange of money. It's the exchange, the negotiations, if it applies to the solicitation for employment or the solicitation. How do these transactions normally take place, if you know? So there will be a bunch of guys hanging around and somebody who needs a day labor or a number of day laborers swings by and what happens to them? So normally you'd have a group of day laborers congregating, you'd have a car that would pull up, it stops in traffic, the day laborers approach the vehicle and solicit employment from the motor vehicle and that has been the typical, from the enforcement, you'd have the solicitation. What happens next? Do they get in the car and drive away? Yes. So this is sort of a pickup place. So you strike a deal and if the deal is mutually satisfactory, one or more people get into the car and you take them to do the work for you, right? Yes, Your Honor. Now you had a question earlier and either you didn't give an answer or I just missed it. Why isn't that entire transaction simply regulable by cops standing there and saying anytime anybody stops, they give them a ticket? It just, it has, it's very labor intensive. It clearly didn't work. That's what the city first tried for several years and even at the lower court when that question came up, there was a comment from counsel that they would It must not be any more labor intensive to arrest people on the sidewalk or any less labor intensive to arrest people on the sidewalk than it is to give tickets to people pulling up in cars. My guess is it's easier to get the car than to, you know, a guy on the sidewalk could run away. It's much harder with a car. You've got a license plate and, right? I'm just not sure what the... Four years the city did try and, you looked at it, it just, it was, it was... And Redondo Beachian's scoff loss when it comes to parking? It wasn't so much the parking. It was that it just didn't work to enforce the ordinance. It was very labor intensive that if you didn't stay there that the people would continue to congregate. You'd have employers continue to come to that location. And the city tried several things. It's not a hypothetical as the other side has posed that this would work. It did not work. The city tried several different attempts. Is it standing on a sidewalk by a legal parking space and having the employer stopping at a legal parking space and having somebody go up and talk to them, is that a violation of the ordinance? That is not a violation of the ordinance. It's never been enforced that way. It's just, it's, that has not... So, therefore, all you have is a bunch of people who are illegally stopping, cut their cars, or are going out into the middle of the street. And how is it different to enforce that than to enforce the rule against people asking them to do that? I'm really baffled. Again, part of it is the... Standing on the sidewalk is not a problem. Standing on the sidewalk is not a problem. So how is this enforcement any different than simply enforcing, don't stop at a, you can't park, stop at an illegal place? Well, as a practical matter, they are, they're different in terms of sentencing, in terms of how that you can get probation for the one, you can get stay-away orders for the one. You can have a situation where it can be controlled. The city has no control over the vehicle code issues, notwithstanding being a charter city. But you also have an ordinance that prohibits people from standing in the roadway if it interferes with the movement of traffic. So you already have an enforceable ordinance to deal with the employee sign, don't you? And again, in terms of looking at a facial challenge, it's not the least restrictive means that the city could come up with. It's a question of whether or not this is something that was narrowly tailored. We believe it is narrowly tailored to promote that significant government issue. And as a practical matter, given the fact that you've had, you know, 24 years of history, that this was the one ordinance that was successful. It was enforced by, in terms of complaints from citizens. It would be enforced. The problem would disappear. And then you would have, a few years later, a new round. The only thing that was different here is that in 2004, you ended up with a facial challenge to this ordinance that is before the Court now. Mr. Webber. A seriously challenging standing? Yes. In a 28-J letter? We wanted to point out the Lake Forest case that this Court has decided, and it is virtually identical to this case. Well, but you really didn't make that argument that's out in the 28-J letter to the district court, did you? We did. Well, it was prior to the Lake Forest decision. We did object to standing throughout. You objected to standing, but I didn't see any place, reading the record pretty carefully, that you argued to the district court or to us, before we got that case, anything about the fact you shouldn't be allowed to talk about standing on subject judgment if you didn't put it in your complaint. Well, again, that's an issue where the plaintiffs have the burden of proof. Well, I understand they – but just a minute, counsel. You're not answering my question. I understand they have the burden of proof, but we now are not on standing itself. We're talking about procedures to get to whether you can challenge standing. And I understand that in order to have a procedure to challenge standing, somebody ought to make it to the poor DJ, having been in his position once before, and he ought to be able to rule on it, or somebody ought to get it before us. Now, there we got a new case, and it may be great, but if the district judge didn't get a chance to look at it, and neither did we before this case comes out, then why should I make that the issue here? That's the question. Not whether they have standing or not, because they have enough in their declarations for summary judgment to make standing. But we did object to standing throughout. They did not plead the type of standing that they proposed to submit to this court or to the district court in terms of proof standing. And so, therefore, since the Lake Forest case says you can't at that later date fix improper pleading by adding the declarations. Since we came with a case after what we did that now supports us, we're going to throw that at you, even though we didn't make the argument to the poor DJ? But we did make the argument. We have tried throughout to preserve the issue of standing. We've clearly objected to the district judge in terms of the issue of standing, but the standing was not proved by the plaintiffs. Frankly, then, are you suggesting if I find standing based on the declarations of MDLON, as did the three-judge panel, that I really haven't got to address any other question relating to standing? Because the three-judge panel looked very good at the declarations that have been And based on the declarations and the complaint, they found standing. Now you're throwing a new curve at us, which is it isn't enough to say it in summary judgment. You've got to say it in your complaint. But I didn't argue that to anybody else. But you should still throw somebody out on standing based on this new idea. Well, we would fall back on the fact the plaintiff has the burden of proving standing. They have the burden of filing the complaint. We've objected to standing throughout this case and have preserved that issue. I see I have a minute. I have a minute. Yes, please. Thank you, Your Honor. We'll hear from appellees. Good afternoon, Your Honors. My name is Thomas Saenz, and I represent the plaintiff's appellees in this matter. This action relates to Redondo Beach ordinance that was adopted some 24 years ago. As this case went along, Redondo Beach added a contention that despite the plain language of this ordinance, its only effort was to bar that solicitation that resulted in a car stopping in traffic. Now that concern, which they brought up in this litigation, could have been easily addressed through existing laws against jaywalking, against obstructing traffic, against illegally stopping. But instead, they put together and adopted an ordinance modeled on this. But they say it's retarded, it's not adequate. That's what they say. Yes. But, of course, they put nothing in the record that would indicate why it's not adequate. And as you know, Your Honor, one of the tests that they have to satisfy to render this ordinance constitutional is that it's narrowly tailored to serve a significant government interest. The first test that's been articulated by the Supreme Court for determining if there is no narrowly tailored doesn't mean that it has to be the narrowest way of doing it or that there isn't some better way of achieving the same end. That's correct. You have to be able to demonstrate, prove, because it is the burden of the city, that its aims could not be achieved less effectively absent the regulation. Well, they've asserted that, but I don't think there's anything in the record or anything in logic to explain why, if your concern is about... Say we tried it the other way, it didn't work. Well, I have to say, Your Honor, 24 years later, there are still day laborers on the streets of Redondo Beach, so it appears that this ordinance doesn't work either. And since you're comparing the two of them, the question is, could they have achieved their objective without regulating speech? I mean, you say that, is that in the record? I don't know what there is in Redondo Beach. Well, what's in the record... I didn't see any when I drove through there this morning. There are day laborers there. They have been there. They're the ones who brought this case as a result of enforcement action that was undertaken by the city of Redondo Beach when the case was commenced. They are still there. They are there because there is a demand for the services that they provide. This is an exchange between both a willing employer and a willing employee. Mr. Science, let's say, just hypothetically, let's say that I think that the case was decided by the Supreme Court. If ACORN is good law, tell me why ACORN isn't good law and why, you know, what would the U.S. Supreme Court, how would they decide this case? Should we take ACORN off the table? I think that ACORN... That makes it better for you? I think that ACORN is a decision that is no longer good law, and I think this court should say that. Nonetheless, I think that there are distinctions between this ordinance and the one in ACORN that even if ACORN remained good law would render this ordinance still unconstitutional. But ACORN is no longer good law as to the facts of ACORN or because the ordinance is broader than the facts of ACORN? I think the ordinance, both in ACORN and in this case, in covering solicitation of business impact contributions, is broader than what was directly addressed by that panel. They were dealing with tagging, the solicitation of money. Right. So as to tagging, is ACORN good law? As to the particular facts of ACORN? Sure. I think there the Supreme Court has made clear if you're talking about solicitation for an immediate exchange of money, that's content neutral. In the middle of the street with a really worse traffic problem. That's content neutral. And as content neutral... What's so different about having somebody step into your car? That's an immediate transaction there, too. You don't actually put out cash, but surely cash is not what was the key in ACORN. It was the fact that you had an immediate transaction, immediate exchange. If the way these transactions work is that you have a negotiation and as a consequence somebody steps into the car, why isn't that equivalent? Well, in fact, the way this occurs, Your Honor, there's no negotiation. You say you need workers, they get in the car. You tend to negotiate at the work site. So it's fairly immediate you get in the car and drive on, first of all. Second... There it is. So how is that different from pulling out money and handing it to having somebody get in your car? Both of them involve the need to have the vehicle stationary long enough for it to occur. Both of them require some sort of communication between the parties. I don't see what the difference is. I think there are two differences that are important. First, I think the Supreme Court has discussed, as well as a discussion in ACORN itself, that exchanging money often is a longer transaction. The person first has to decide. The person standing in front of me is asking me to donate to this. Do I want to give to that? I take out the money or the credit card. I bet you that if we had a race, you know, I could put out a dollar a lot faster than you can load a couple of people in your car. I take that bet, Your Honor. They just don't strike me as being that different. I take that bet. But I think the second important distinction is if they really were interested in targeting anything... It would be close anyway, wouldn't it? It would be close. It would be close. I mean, the point is they're really equivalent. But, of course, what the Supreme Court described and what was described in ACORN is that that's not typical. Ordinarily, the person has to decide, do I support that cause? Do I have the right change or do I want change back? Will I write a check? Will I give them a credit card? That was what was described by the Supreme Court in the solicitation of funds case. Are you discussing this because of the content neutrality issue or because of the narrow targeting issue? Because with regard to the second, it seems to me that you're leaving out the key fact of ACORN, which is it was in the middle of this traffic flow. Yes. I'm discussing it right now, Your Honor, with respect to content neutrality. Nice. With respect to narrow tailing, there are significant differences, both between what happened in ACORN and in the kinds of cases that I've found narrow tailoring. But I think the other critical distinction is that if the city of Redondo Beach, in this case, were interested in stopping anything that involved an exchange, it could have done that more explicitly. Because there are solicitations that involve exchanges in the roadway that are not barred by this ordinance. And that's because they've limited it to employment, business and contributions. Can I just, following up on Judge Verzon's point and, indeed, the Chief's point, he asked how these transactions take place. And from what I understand, the people in the cars come there for the express purpose of hiring the day laborers. That's correct. Is that correct? That's correct. Because that's what the B ordinance, the B part of the ordinance is for, right? That's right. And that's not part of ACORN, right? That's correct. ACORN has no such equivalent situation. There are two parts of this ordinance that were not in ACORN. The B portion that has to do with employers who park and the definition of street or highway in A that covers sidewalks, curbs, medians, et cetera. Right. So the reality is that, at the very least, ACORN is really distinguishable for the B part. Because here, I mean, this is every bit as much the, in quotes, fault of the proposed employer as it is of the proposed employee, is it not? Yes. That's correct. I don't mean to use the term fault. What I mean is these people volitionally come to the place for the purpose of hiring the horn on that. Yes. There's a willing employer, a willing employee. Both of them are involved in this exchange. They're both at the site when it occurs. I agree that ACORN is distinguishable even if it were to remain good law, largely because of the distinctions that we've identified. That's an interesting distinction and certainly true, but it seems to me it cuts against you. I'm sorry. Why is that, Your Honor? Well, it seems to me that that makes it much more of a business transaction. I mean, the guy who's driving along and all of a sudden somebody stops, knocks on the window and says, give me a dollar because I'm hungry, you know, really is just there to speed stop at a traffic light. When you've got both sides there to do a, to engage a commercial transaction, this suggests that this is a marketplace. This suggests that this is a kind of activity where there's commercial, there's commercial intent on both sides. And where the, and therefore the ability to regulate by the government is much higher. There is a higher ability to regulate commercial speech. I mean, that's why it cuts against you, right? It potentially cuts against us. Okay, there we go. But a couple of points first. The city of Redondo Beach has never attempted to defend this as a regulation of commercial speech. It would be difficult for them to do that because their own law includes contributions among the solicitations. Yeah, I didn't say commercial speech. It's a commercial activity. It's a marketplace, which raises all the problems that you have when you have an organized marketplace. Yes, it is a marketplace. It should be regulated. You have traffic congestion. You have, you know, competitive behavior. You know, I don't know what the, how the people on the sidewalk decides who gets the next, the next potential client, whether there's any life involved in that. But my guess is there's some of that. This case would be an entirely different case if we were here talking about a regulation of that marketplace. We are talking about a regulation of speech that covers not only this transaction, but also any solicitation of business, any solicitation of contributions. We're talking about a, an attempt by a city that is not trying to regulate this marketplace, as they've admitted in this litigation. That anybody has been stopped for this, violating this ordinance that wasn't involved in precisely this kind of transaction? I mean, have they arrested a lot of Girl Scouts? Have there, have there been a lot of political? I mean, you know, is there any indication that this has been applied in practice to anything except this very kind of commercial transaction? Certainly there's nothing in the record that indicates there has been enforcement as to any other kind of speech. You have to use an overbreadth analysis. So you have a, a analysis that suggests, well, you know, it's okay as to us, but, you know, there are all these other people being regulated. And that's a, that's a very sort of dangerous, precarious position to take. Of course, I think that there are strong arguments for why day laborer speech in this case, as we've been discussing. This regulation is unconstitutional specifically as to that speech. However, it is certainly true that there is a danger with this. A parking lot, right? I'm sorry? This could be conducted in a parking lot off the street altogether. It could if the owner of the parking lot permitted it to occur there. Or somebody paid them to, right? Paid the owner of the parking lot? Yes. Yeah, so, I mean, this is not something that inherently has to be done. It's not like a parade or a, or a, a demonstration or a, anything like that where you inherently have to use a public street or park. This is something that could easily be done if just enough money is thrown at it. It could be done in a, in a, in a empty stadium, in a basketball court when it's not being used for that purpose, in a, in a, in a, you know, one of those outdoor theaters that no longer exist, right? It all could be done there. Certainly, and so could demonstrations and so could parades. But they don't occur in parking lots or stadiums. Parades are different because parades are supposed to be in your face and demonstrations are supposed to be in your face. The very point is to have them be there and disrupting traffic and be seen when people go about their daily business. There's nothing about this transaction that would diminish it in any way if the location of the transaction were not sort of in the middle of traffic if it were in a parking lot a couple blocks away where nobody except the participants are present, right? With a parade and a demonstration and with day labor, it's a matter of reaching your intended audience, folks who you want to get your message to. So the... What would you have us do with the fact that the actual enforcement patterns do seem to be quite limited, although there's no written interpretation or limiting construction? What I would have the court do is direct the city of Redondo Beach to write the ordinance that it wants to enforce, that it indicates it has been enforcing. And what about Chief Judge Kuczynski's suggestion that you then have to meet overbreadth standards and how do you do that exactly? Why do you argue that you meet overbreadth standards? Do you meet overbreadth standards? Does it matter? We do meet overbreadth standards. For overbreadth purposes and they haven't actually enforced it otherwise? Your Honor, the danger of chilling speech comes in reading what the ordinance says. I don't know why Girl Scouts are not on the streets selling cookies in Redondo Beach. I don't know why or whether they are. They may be there and not be enforced or they may not be there. We don't know which it is. Exactly. We don't know which it is. They have mothers. That's why. That could be true, too. But I would point out that this applies to all of Redondo Beach, even tight streets that aren't very busy, residential streets and the like. If you read the ordinance itself, it would apply in those circumstances. There are no instances of Girl Scouts standing on street corners selling cookies before the ordinance, right, that the record reflects? I honestly don't know, but it's certainly not in the record that they were there before 1980. If you were, okay, this is another hypothetical. If the Court were to find that the language was content neutral, but that it was not narrowly tailored, would this Court have to revisit ACORN and Berger? With respect to narrow tailoring, no, I don't believe so, Your Honor. I think if you look at the standards for narrow tailoring, starting with what I mentioned previously, can the city's objectives be achieved without regulating speech? The answer is clearly yes. Well, what resolution would require revisiting Berger and would create a tension with Berger? I don't see anything in this case that would create a tension with Berger, Your Honor. I think that with respect to all elements of the test, content neutrality, I think that Berger is consistent with this case, except to the extent that it is read, I think, overread as saying that ACORN actually blesses an ordinance that goes beyond what ACORN itself said by covering sidewalks. I think that with respect to narrow tailoring, Berger is correct and the standards that are articulated there applied here would render this ordinance unconstitutional. And with respect to alternative avenues of communication, that is an independent reason why the Redondo Beach Ordinance should be held unconstitutional. Exactly why do you think this is not content neutral? Is it because you don't think solicitation is limited to the exchange of money? Is it because this isn't the exchange of money? Is it because it's limited to employment, business and contributions and not other things? Or exactly why? It's all of the above, Your Honor. You start with the fact that when you look at it, it does not cover all speech. At a certain level, all speech is solicitation. If I'm performing, I'm asking for your approval. If I'm asking for your vote, I'm soliciting your vote. If I'm asking for your signature on a petition, I'm soliciting your signature. Every kind of speech is a solicitation. So with respect to the broad category of speech, this signals out particular content. That's solicitation that seeks employment, business or contributions. By that test, it is content discriminatory. What do we do with a case like Hill which said that approaching for three different categories of speech was content neutral or at least was susceptible to intermediate scrutiny? I'm going to be completely candid. I think Hill is a difficult case to explain. I think sometimes First Amendment jurisprudence is like a blob with a skeletal structure beneath it. And sometimes as you reveal some of that skeletal structure, other parts of it become obscured. But I think Hill deals with a situation where the specific context, where the specific timing, where the specific parties involved tell you that there is a violation so you don't actually have to look at what is the content to determine that there is a violation. We've never held that the officer must read a test is a problem. We've never relied on that. This is content neutral. So it's pretty clear on that point. What you have said is, I think correctly, that that test is evidence but not dispositive as to content discrimination. And that's why I'm distinguishing what happens in Hill where it's not really closely attending to what is said. It's not picking one of three categories out of dozens, as occurs here. It's not? It's only one specific kind of speech in a specific context involving specific parties. So you're saying we should... That's the only way I can explain that case. ...we should confine Hill to its particular facts, is your recommendation of Hill? If you have an alternative situation where you can tell from the context, from the parties, from the timing, from the place that there is a violation, I suppose that would be an outcome dictated by Hill. But other than that, I think Hill is fairly unique when you look at all of the jurisprudence from the Supreme Court about content discrimination. If we change just a little bit from the content and go to the narrowly tailored situation, if I look at what the Supreme Court says on facial challenges, it seems to me that the Supreme Court is saying that no set of circumstances exists under which the challenged ordinance would be valid or that the statute lacks any plainly legitimate sweep. It seems to me that your argument is about plainly legitimate sweep. Would you agree? Yes. And in the First Amendment context, that specifically means is it chilling speech that is legitimate? Okay. So how do I then look? I mean, I look at Washington State Grange versus the Washington State Republican Party where it suggests that we generally don't apply this strong medicine of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested law. It doesn't seem to me that in this particular situation that whether we're talking about somebody right in the street or on the sidewalk that it differs from that particular situation. It's just a hypothetical example of how the government could theoretically apply it and therefore why is it then not absolutely narrowly tailored? I don't think it's entirely theoretical, Your Honor, first of all. What's not theoretical? What examples from this record, evidence, do I have that it wasn't narrowly tailored? If a day laborer is standing on the sidewalk and never enters the street, they're in violation of this ordinance. So, if they do the same thing day laborers do that they're supposed to be not doing, why is that a problem? If the day laborer is doing what the city concedes is permissible under this ordinance, under this ordinance they still would be violating it. The city contends that a day laborer could stand on the sidewalk and as long as they somehow indicate don't pull over illegally, go to a side street, come into the parking lot, and I will meet you there. The city argues that that is not a violation that they would enforce. But under the terms of this ordinance that is a violation. That day laborer, regardless of how vociferously they indicate please pull into the parking lot is still guilty of violating the ordinance as the city has construed it if that driver stops in the street and ignores the wishes. That's a nice hypothetical but I've never seen anybody do that. I've seen it, Your Honor. I've seen day laborers who want folks to pull over pull over into a parking lot. It does occur. How do they communicate this to a moving vehicle? Signaling to pull into the parking lot. Now, they're not always paid attention to that is sometimes ignored. Folks who are in a hurry to hire folks are in a hurry to hire folks. Let me ask you this. Let's assume for just a moment that this ordinance is content neutral and that it's narrowly tailored. Whether I agree with that is not really relevant here. But you've got the second issue which is whether the city has met its burden of showing that there are ample alternative channels for communication of information. Yes. That's frankly the thing that troubles me the most about this matter. What is there in the record to indicate that there is an alternative means for these folks to express themselves in the city of Redondo Beach? Your Honor, there's nothing. There's nothing in the record to indicate that there is an alternative means. There is the hypothetical. Whose burden is it under the constitutional It's the city's burden. It's the city's burden. On a facial challenge though I guess I'm puzzled. Do we have to show ample alternative channels for these individuals this group of day laborers or do we really have to say are there any ample alternative channels for soliciting business employment contributions generally on a facial challenge? What's our job? I wish I had a clear answer to that because I had the same question in my mind as I reviewed the record here because it seems as though both sides focused on alternative channels for day labor speech. There was no showing as to any other kind of speech whatsoever. So that's why we're confined to what was described here though I think the city would have a burden of demonstrating that there are alternatives for others as well. But that obviously depends what level we're operating on. If we're only going to look at the day labor situation and think there's an overbreath problem then for alternatives we're going to look at the day labor problem. Well I agree. I think that the city ought to be required to show that there are alternatives available for all sorts of speakers. On the other hand if we're going to look at overbreath in general at the ordinance as written then one would think that you'd get to narrow tailing before you get to the alternatives. Yes. That's correct. But if you get to the alternatives and you focus solely on day laborers I think that there's nothing in the record that the city has produced to demonstrate an actual alternative channel. And in fact I think the channel that they've relied upon is inappropriate. Relying on a private property owner to hypothetically provide an alternative channel I think is not allowed under this court and the Supreme Court's precedent. And there are other municipalities that have attempted to create their own alternatives. Yes. By creating hiring centers for day laborers. Places or phone calls or something. That's correct. The hiring centers that were referred to in this record if I recall correctly were nowhere near the city of Hermosa Beach. They could no more point to Manhattan Beach or Hermosa Beach and say there's your alternative as they can point to a private property owner and say there's your alternative. So if for example there was an ordinance that said that certain street corners were off limits but just certain street corners. And that would leave the alternative of the other street corners, the other areas in the city and the question would be whether those were realistic alternatives for the speech that's involved. But there was obviously no demonstration of that here because this is an ordinance that applies to every part of the city of Redondo Beach. So do you have standing? Yes. We have standing both organizational standing. We have representational or associational standing and overbreadth standing. But your standing wasn't alleged in your complaint. It was not alleged in the complaint, Your Honor. The organizational standing was not. The representational standing was. I think that was a mistake. I think Lake Forest presents a problem. The distinction here is, as you pointed out, that decision came out after the district judge read the declarations at summary judgment and concludes that there's organizational standing, that gets you past the lack of pleading. But I think in this case because Lake Forest happened  the district judge did What difference would that make given that the standing goes to our Article 3 powers? Because I think you have an indication here that the district judge would have allowed an amendment of the complaint because the district judge did conclude there was organizational standing. Even if that weren't the case, wouldn't our remedy be to send it back to the district court give you an opportunity to amend and address Lake Forest? Yes. I think that that's the appropriate resolution if our standing comes down to that. Because we also have representational or associational standing here as well. I think that the only argument that's been put forward by the City of Redondo Beach about the legal right to work is both inapposite and wrong on the law. Is there anything about subsection you're challenging subsection B as well as subsection A? Yes. How is subsection B and I guess this is what Chief Judge said, is that subsection B applies even to a legally parked vehicle, whether that's on the major street, a side street, anywhere on the streets of Redondo Beach. So it therefore takes away all listeners except those potentially who pull into a private lot in order to engage in an    a vehicle. I don't know what this person was saying that would be attempting to hire them. Wouldn't be hiring them. It says attempts to hire, both in section B and attempt to solicit in section A, although I have to confess I don't know how you get an attempt to solicit if you require an actual stop of a vehicle before you conclude that there was a violation of the ordinance. Another reason why I think there are proffered construction is too late and inconsistent with the plain language as this Court has repeatedly concluded when you have a narrowing construction. If they were to put out some other of these kinds of cases, there have been enforcement policies that have been written up. If there were such a written up enforcement policy that was consistent with what they're now saying, i.e., in the street, if you have a transaction only for certain intersections only with regard to employment, would that be valid? Well, I think this would be a different case. I think there would still be serious concerns about how consistent that is with the actual language of the ordinance. And the plain language of a law is a very  part of the ordinance. And the plain language, both excising certain words and adding words, particularly the restriction to particular intersections when the law as written applies throughout the city of Redondo Beach, that covers sidewalks as well as alleys, medians, and parkways, that covers in subsection B only solicitation of employment, not solicitation of business or contributions. We have an ordinance that is content discriminatory on its face by not covering all solicitations that would require a car to stop. This ordinance, for example, would not stop someone soliciting signatures on a petition, whether a petition to qualify a measure for the ballot or a petition to have the Rock and Roll Hall of Fame immediately introduce Britney Spears no matter what the petition is. If you're seeking that signature from a car, it's not barred by this ordinance, but it is the kind of exchange that they have indicated they have problems with. They've singled out particular solicitation rendering it content discriminatory. The narrow tailoring problem has to do with the fact that this could lead to a car stopping illegally in traffic. The narrow tailoring problem, the lack of a record of   indicates that this Court should conclude that the district court was right that the Redondo Beach ordinance is unconstitutional. The narrow tailoring problem is unconstitutional as a violation of the First Amendment. Thank you, Your Honor. Mr. Webb, I want to ask you about the alternative channels. I'm hoping you can answer the question for me. Do you agree the burden is on the City to show it is unconstitutional? I'm assuming for a minute that the narrow tailoring is close enough. We don't have to worry about that. What real alternative channels for communication and information exist under this ordinance for these proper alternative channels of communication are in effect in this case because, again, the A section is exactly based on that ACORN statute. So you get to import ACORN into your record? In terms of that, the record shows we are dealing with contributions to a charity. ACORN was dealing with contributions to a charity as to which the audience is random. And we're trying to reach essentially a random audience. And here you're dealing with wanting to reach particular people, those people who want to hire day laborers. Isn't that an entirely different thing in terms of alternatives? But in this case, the alternatives still, some of the alternatives I recognize are still appropriate. The leafleting the cars, the pull over here, anything that they wanted to give communication. So it would be    that. And one of the things that the council mentioned talking about first amendment law in terms of being a blob on top of the skeletal system, the city tried to do exactly what this court said was okay. And the record shows that the ordinance literally applies to someone standing on a sidewalk holding a sign. But this court said that in ACORN. It said it in footnote 9 and it said it in rejecting the overbreath analysis. And so us putting it in there did not change whether or not it applied to a sidewalk. It did apply to a sidewalk according to this court in ACORN and it applies in our case. The only difference is we took a vagueness challenge away by giving additional notice. The city shouldn't be punished for giving additional notice of something that was specifically in ACORN. Thank you. Okay. Thank you. In case you're sorry, we'll send somebody. Well done.
judges: Kozinski, Thomas, Graber, Gould, Berzon, Bybee, Callahan, Bea, M Smith, Ikuta, Nr Smith, Cjj